**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-1913**

JAMES SCHNEIDER,

Plaintiff - Appellant,

v.

GIANT OF MARYLAND, LLC,

Defendant – Appellee,

and

THE STOP & SHOP SUPERMARKET COMPANY LLC; BILL HOLMES,

Defendants.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.  Peter J. Messitte, Senior District Judge.  (8:07-cv-01995-PJM)

Argued:    May 12, 2010                Decided:  July 26, 2010

Before NIEMEYER, DAVIS and KEENAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Orva Lee Boothby, Washington, D.C., for Appellant. Lesley Pate Marlin, VENABLE, LLP, Washington, D.C., for Appellee.  **ON BRIEF:** Robert G. Ames, VENABLE, LLP, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

James Schneider ("Schneider"), who suffers from Type 1 diabetes, sued Giant of Maryland, LLC ("Giant"), under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § § 12101, et seq., alleging disability employment discrimination. The claims arose from Schneider's employment at Giant, first as a pharmacy supervisor and currently as a pharmacy manager. Specifically, Schneider claimed that Giant illegally failed to afford him reasonable accommodations when, as a result a diabetes-related blackout he experienced while driving, his driver's license was suspended, and when it refused to return him to his supervisory position after his license was reinstated. The district court granted Giant's motion for summary judgment. For the reasons stated within, we affirm.

I.

Schneider was diagnosed with Type 1 diabetes mellitus in 1963.[1] The diabetes contributes to his peripheral neuropathy,

---

[1] Type 1 diabetes mellitus, unlike Type 2, is characterized by the loss of insulin-producing beta cells in the pancreas, which leads to insulin deficiency. Type 1 diabetes generally develops in childhood or adolescence, and is treated with diet, exercise, and drugs that reduce glucose levels, including insulin. Later complications of Type 1 diabetes include vascular disease, peripheral neuropathy, and predisposition to infection. No treatments definitely prevent the onset or progression of type 1 diabetes. The Merck Manual of Diagnosis and Therapy § 12.158 (Mark H. Beers et al. eds., 18th ed. 2006).

retinopathy, and foot ulcers. Schneider's diabetes has affected his ability to walk, stand, digest food, and his energy levels. Since early 2001, Schneider has suffered from foot ulcers and was advised by medical professionals to avoid weight-bearing activities. Since 2002, he has been unable to stand for long periods of time and has avoided recreational activities that require the use of his feet. Schneider currently treats his diabetes with insulin shots; he has had multiple surgeries for his foot ulcers.

Schneider began working for Giant in 1979 as a staff pharmacist. In April 2000, he was promoted to regional pharmacy supervisor. As a regional pharmacy supervisor, Schneider was responsible for all of the pharmacies in a district; among other responsibilities, his duties included making sure that the pharmacies complied with state and federal law, maintaining inventory and proper records, maintaining proper staff levels, and ensuring knowledge of pharmacy regulations. Regional pharmacy supervisors were also responsible for the day-to-day operations of the pharmacy departments in various stores, including but not limited to hiring and firing personnel, budgeting, and inventory. In carrying out these duties, the pharmacy supervisor is required to travel — usually by driving — from store-to-store within the specified district. Schneider was also required to attend frequent meetings at Giant's

headquarters in Landover, Maryland. Although the position of pharmacy supervisor involved considerable travel, many of the major duties required by the position, and perhaps a majority of them, could be completed in an office. At the time of his promotion, Schneider's district covered an area from southern Maryland to Fredericksburg, Virginia.

On June 2, 2005, Schneider was involved in a car accident when he blacked out while driving in Virginia during work hours. At the hospital, it was determined he had had a hypoglycemic reaction, a not uncommon occurrence among patients with diabetes.[2] On July 7, 2005, the Virginia Department of Motor Vehicles ("the DMV") notified Schneider that he was required to complete a medical report, and on August 12, 2005, the DMV notified him that his driving privileges would be suspended for at least six months in accordance with the DMV's Seizure/Blackout policy.

On August 14, 2005, Schneider informed Russell Fair ("Fair"), his supervisor, of the suspension of his driving

---

[2] Hypoglycemia is the most common complication of insulin treatment, and occurs when the blood glucose levels drop below normal levels. Symptoms of mild hypoglycemia include headaches, light-headedness, blurred vision, and confusion. Symptoms of severe hypoglycemia include seizures and loss of consciousness. Type 1 diabetics who have suffered from the disease for a long period may be unaware of hypoglycemic episodes because they no longer experience autonomic symptoms. The Merck Manual of Diagnosis and Therapy, § 12.158.

privileges at a meeting at the Landover headquarters (but not of the reason for the suspension). Schneider drove to Landover with another pharmacy supervisor, John Colella ("Colella") and during the drive to the meeting, Colella offered to take responsibility for the stores that were farther away from Schneider's home and for Schneider to take over the stores that were closer to his residence. At the meeting with Fair and Colella, Schneider suggested that he could keep his supervisory position during the period of his license suspension by having one of his family members drive him to a store, and then taking taxis from store-to-store to carry out his responsibilities. He offered to pay the cab fare and to seek reimbursement only for mileage, as he did before the license suspension. Schneider also proposed that: (1) as Colella had agreed to switch stores with him, he could assume responsibility for all the central Virginia stores, thus narrowing his area of travel; and (2) he would work nights and weekends, when his family members could drive him from store-to-store. In this case, Schneider asserts the proposals he offered during this meeting constituted a request for reasonable accommodation under the ADA.

Fair told Schneider that his proposed alternatives were not acceptable, would not work, and would not be approved. Ultimately, Schneider and Fair agreed that Schneider would be reassigned to work as a pharmacy manager at a pharmacy near his

5

home, but with the same pay as a pharmacy supervisor. Another employee was reassigned as a pharmacy supervisor to take over Schneider's stores in an official announcement.

The DMV reinstated Schneider's driving privileges on December 28, 2005. In the meantime, even before his driving privileges had been reinstated, Schneider began having increased problems with weight-bearing activities while on his feet. These problems worsened in the fall of 2005, when his doctor advised him to reduce weight-bearing activities. Unlike his position as pharmacy supervisor, Schneider's position as pharmacy manager required him to stand on his feet most of the day. In any event, it is undisputed that he never asked for any assistance in reducing the amount of time spent on his feet at work during the fall of 2005.

By January 2006, Schneider was in constant pain whenever he had to stand, but continued to stand at work for long periods of time. On January 19, 2006, Schneider's friend and podiatrist, Dr. Stuart Kramer ("Dr. Kramer") sent a letter to Fair recommending that Schneider return to his previous position as a pharmacy supervisor because the change in his job position had severely exacerbated Schneider's diabetic foot problems. After Giant received the letter, Colella met with Schneider to discuss the letter and his work situation. At the meeting, Schneider told Colella that "he was fine, that he was going to be fine."

J.A. 248.  Schneider then had foot surgery in May 18, 2006, as a result of his exacerbated foot condition.

On September 25, 2006, Schneider was admitted to the hospital after he blacked out at work.  On October 3, 2006, Colella and Schneider had a meeting with Guy Mullins ("Mullins"), the HR representative of Giant.  Mullins discussed a note from Schneider's doctor requiring limited duty and wanted to know what that meant.  Schneider explained that the doctor just wanted to make sure he was able to work his shift.  Mullins asked Schneider if he needed any special accommodations and Schneider replied that he was just concerned about standing on his feet all day.  Mullins replied  that Giant would need a note from Schneider's doctor stating what his limited duties were, and Schneider replied he would get that note to Mullins.

## II.

On July 26, 2007, Schneider filed a pro se employment discrimination complaint in federal district court (misidentifying his employer as Stop & Shop Supermarket Co., LLC).  On March 31, 2008, Schneider, now represented by counsel, filed a second amended complaint naming the correct defendant, Giant.  In the second amended complaint, Schneider asserted two claims:  a state law discrimination claim and a claim that Giant had violated the ADA, 42 U.S.C. § 12101, et seq., in

discriminating against Schneider and by failing and refusing to make a reasonable accommodation.

After the completion of discovery, Giant moved for summary judgment and the district court held a hearing. Schneider withdrew his state law claim at that time, leaving only his ADA claims for consideration by the district court. At the conclusion of the hearing, the district court, ruling from the bench, granted Giant's motion for summary judgment. The district court concluded that Schneider did not project sufficient evidence to meet his burden of showing that he had a disability cognizable under the ADA at the time he was reassigned after his driver's license was suspended. Furthermore, the district court concluded, Schneider did not communicate that he had a "disability" at that time. The district court also determined that the only accommodation sought by Schneider at the time his driving privileges were restored (and after his condition had worsened) was a request for a transfer to his prior supervisory position, which, having been filled by another employee, Giant had no obligation to grant under the ADA.

Schneider has timely appealed from the district court's adverse judgment.

III.

A.

8

We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the non-movant. Waller ex rel. Estate of Hunt v. Danville, VA, 556 F.3d 171, 174 (4th Cir. 2009). Summary judgment is not appropriate unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

B.

The Americans with Disabilities Act of 1990[3], 104 Stat. 328, 42 U.S.C. § 12101 et seq., prohibits discrimination by covered entities, including private employers, against qualified individuals with a disability. Under the Act, "disability" is defined as:

---

[3] The ADA was amended effective January 1, 2009, after this suit was filed. See ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Congress did not expressly intend for these changes to apply retroactively, and so we must decide this appeal based on the law in place prior to the amendments. Landgraf v. USI Film Prods., 511 U.S. 244, 270-71 (1994); Shin v. University of Maryland Medical System Corp., No. 09-1126, 2010 WL 850176 at *5 n. 14 (4th Cir. Mar. 11, 2010) (unpublished) ("Our sister circuits have found that the 2008 ADA amendments are not retroactive . . . and we see no reason to disagree with their conclusion").

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Discrimination under the ADA includes a failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee" id. § 12112(b)(5)(A), and "denying employment opportunities to a job applicant or employee" where the denial of the employment opportunity is based on the need "to make reasonable accommodation," id. § 12112(b)(5)(B).

In a failure to accommodate case, the plaintiff must show "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." Rhoads v. F.D.I.C., 257 F.3d 373, 387 n. 11 (4th Cir. 2001) (quoting Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999)).

To assess a claim for disability employment discrimination, the first question is whether the plaintiff is disabled and is an "otherwise qualified individual." Rhoads, 257 F.3d at 387.

10

A qualified individual with a disability is defined by the ADA as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individuals holds or desires." 42 U.S.C. § 12111(8).[4]  In order to survive summary judgment, Schneider was required to produce evidence showing that he is both qualified and disabled.

Diabetes is not per se a disability under the ADA because a "person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83 (1999).  Whether a person is disabled under the ADA "depends on whether the limitations an individual with an impairment actually faces are in fact substantially limiting."  Id. at 488 (emphasis in

---

[4] Whether "driving" is an essential function of Schneider's former position is disputed.  Giant contends that driving is an essential function of the job as a pharmacy supervisor, and therefore, Schneider was unable to perform an essential function for the six months his driving privileges were suspended.  Schneider contends driving is not an essential function of the job.  The record shows that the job posting for pharmacy supervisor does not include "driving" as one of the job duties/functions, nor is it listed under the preferred qualifications.  Although under "Physical Demand Analysis," the description states "many hours in a car (approximately 30,000 miles yearly)," the description does not specifically state "driving."  In the view we take of the case, we need not further address this issue.

11

original).  Therefore, although Type 1 diabetes is a chronic illness, when successfully managed, it is not a disability under the ADA until it causes a substantially limiting impairment of a major life activity.  See  Kapche v. City of San Antonio, 176 F.3d 840, 847 (5th Cir. 1999) (finding that diabetes is not per se a disability under the ADA); Baert v. Euclid Beverage, Ltd., 149 F.3d 626, 631 (7th Cir. 1998) (same).

The Equal Employment Opportunity Commission ("E.E.O.C.") has promulgated regulations to implement the ADA and has provided that "substantially limits" means:  (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity.  29 C.F.R. § 1630.2(j)(1).  The regulations also list three factors to consider when determining whether an individual is substantially limited in a major life activity:  (i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.  29 C.F.R. § 1630.2(j)(2).  See Heiko v. Colombo Savings Bank, F.S.B., 434 F.3d 249, 256 (4th Cir. 2006) (recognizing E.E.O.C. regulations as proper authority for interpreting the ADA);  Rohan v. Networks Presentations,

12

LLC, 375 F.3d 266, 277 (4th Cir. 2004) (same); <u>Pollards v. High's of Baltimore, Inc.</u>, 281 F.3d 462, 471 (4th Cir. 2002) (same).

C.

Because the analysis of whether diabetes is a qualified disability under the ADA is fact-specific, this court must analyze the evidence bearing on Schneider's diabetic condition as of August 2005, when he claims he first asked for an accommodation, and in January 2006, when he next asked for an accommodation.

<u>Schneider's diabetic condition in August 2005</u>

We agree with the district court that Schneider failed to project probative evidence that he was disabled under the ADA in August 2005 when he asked for an accommodation after his driver's license was suspended. Although Schneider has lived with Type 1 diabetes since his diagnosis in 1963, the illness did not significantly interfere with his daily life until 2001, when he began to have peripheral neuropathy, retinopathy, and chronic foot ulcers. The record shows, however, that his deteriorating condition did not affect his job performance before August 2005. Because of the nature of his job functions as a pharmacy supervisor, Schneider was still able to perform his duties without any problems.

13

There is no legal authority in this circuit that would support the conclusion that Schneider had a disability, as defined by the ADA, in August 2005. Although there were physical impairments that were the result of his diabetes — such as the inability to stand for long periods of time — these impairments were controlled by both medication and lifestyle choices. The Supreme Court has clarified that "[a] 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might','could', or 'would' be substantially limiting if mitigating measures were not taken." Sutton, 527 U.S. at 482 (emphasis added).

In this case, Schneider had long been taking mitigating measures: he administered insulin injections and he would "regularly eat[] breakfast every morning and take many snacks during the day to prevent hypoglycemia during the work day." J.A. 586. Though diabetic, Schneider was unable to show that as of August 2005, the disease had become sufficiently serious to have an effect on his major life activities. Schneider claimed that the diabetes affected his walking, standing, and digestion, but presented no evidence that those activities were substantially limited in August 2005 such that his condition became disabling within the ADA. In fact, at that time, Schneider was not yet experiencing constant pain or foot ulcers from the diabetic neuropathy. See e.g., Orr v. Wal-Mart Stores,

14

Inc., 297 F.3d 720, 724 (8th Cir. 2002) (finding that a diabetic plaintiff failed to show he had a disability under the ADA because he failed to explain how his diabetes substantially affected his major life activities). In short, Schneider produced no evidence that would create a genuine issue of material fact as to whether his diabetic condition constituted a disability in August 2005. See e.g., E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 321 (4th Cir. 2008) (reversing the district court's grant of summary judgment because there was a genuine issue of material fact).

Furthermore, even if we were persuaded that Schneider had projected sufficient admissible evidence that he was disabled in August 2005, Schneider's claim for failure to accommodate his loss of driving privileges would fail because he never made the existence of any such disability known to his employer and did not inform his employer that the reason he needed an accommodation in August 2005 was because of his diabetes. Unlike race or sex discrimination, "there are situations in alleged disability discrimination cases where an employer clearly did not know and could not have known of an employee's disability." Hedberg v. Indiana Bell Telephone Co., Inc., 47 F.3d 928, 932 (7th Cir. 1995). When it worsens so as to substantially limit one's major activities, diabetes is often a "hidden" or "invisible" disability — one that an employer can

15

not easily ascertain from daily interactions with an employee. See also Harrison v. Benchmark Electronics Huntsville, Inc., 593 F.3d 1206, 1213-14 (11th Cir. 2010) (including diabetes in the list of "so-called hidden disabilities").

Although we do not suggest that a single occurrence of a diabetes-induced black-out would render diabetes a statutorily-cognizable "disability" as a matter of law, the record shows that Giant never had notice of Schneider's alleged disability in August 2005 and was unaware that Schneider was asking for "reasonable accommodations" for his "disability" as those terms are used in the ADA. The burden to provide notice is not an onerous one: the employee does not need to mention the ADA or use the phrase "reasonable accommodation," but need only inform the employer of both the disability and the employee's need for accommodations for that disability. E.E.O.C. v. Federal Express Corp., 513 F.3d 360, 369 (4th Cir. 2008).

Here, Schneider conceded on deposition that he never talked to his supervisor specifically about his diabetes when seeking alternatives to driving after the DMV suspended his driver's license:

> Question: At any time during your conversation with Mr. Fair on August 15[th], 2005, did you tell Mr. Fair that your car accident on June 2[nd], 2005 was because of a hypoglycemic episode?
>
> Answer: I don't remember even discussing the accident itself with Russ.

16

> Question: All you discussed was the loss of your drivers license then?
>
> Answer: That was the main — main focus of the conversation.
>
> Question: And it was the loss of your drivers license that led to your reassignment, correct?
>
> Answer: Correct.
>
> Question: And your reassignment to the pharmacy manager position had nothing to do with any physical impairment that you may have had at that time, correct?
>
> Answer: Correct.

J.A. 150-51.

Schneider argues that at the time of the August 2005 meeting, management officials at Giant knew about Schneider's diabetes, so it could only be inferred that they knew he was asking for an accommodation for his disability. This argument is not persuasive for two reasons. First, because Schneider never directly mentioned that he was suffering from acute impairments, i.e., hypoglycemic episodes, caused by his diabetic condition, management should not be held responsible for guessing that the diabetes had progressed to a point where Schneider was a disabled person under the ADA. See e.g., Huppenbauer v. May Dep't Stores Co., 1996 WL 607087 at *4 (4th Cir. Oct. 23, 1996) (unpublished table) (finding that even if everyone knew that the plaintiff had a heart condition, such

17

knowledge would not equal notice that the condition imposed limitations on the plaintiff requiring special accommodations). Second, Schneider never requested the accommodation of allowing him to keep his pharmacy supervisor position by taking taxis to the different stores on his route because of his diabetic condition and disability. Schneider never mentioned that his license was suspended because of hypoglycemia caused by his diabetic condition, and there was no reason for Giant's management to assume such a thing without Schneider's informing them. Giant cannot be faulted for failure to provide reasonable accommodations under the ADA where it did not know of Schneider's disability. See Huppenbauer, 1996 WL 607087 at *7 (holding that "where an employee failed to make a clear request for an accommodation and communicate it to his employer," the employer has not violated the ADA); Larson v. Koch Refining Co., 920 F. Supp. 1000, 1004 (D. Minn. 1996) (holding that providing accommodations is only appropriate where the employer knows that plaintiff is both disabled and in need of accommodation).

In sum, at no time on or before August 2005 did Giant know that Schneider had a disability that required accommodation, and the evidence in the record does not support the conclusion that Schneider was disabled under the ADA. Thus, Giant had no obligation to provide reasonable accommodations for Schneider because of his diabetic condition. Therefore, the district

18

court's grant of summary judgment on Schneider's claim that Giant violated the ADA in August 2005 must be affirmed.

### Schneider's diabetic condition in January 2006

Schneider also claims that Giant violated the ADA in January 2006 because he requested, but was refused, the reasonable accommodation of being transferred from his pharmacy manager position back to the pharmacy supervisor position so that his diabetic foot ulcers would not worsen. It seems largely undisputed that by January 2006, Schneider was disabled because of his diabetic condition, and that Giant knew about his diabetes. Schneider's foot ulcers, a condition resulting from his diabetes, were exacerbated from the prolonged standing and excessive weight-bearing activities required for his pharmacy manager position. Additionally, his supervisors knew that Schneider's diabetic condition was causing him pain since by January 2006, Schneider had spoken to his supervisors about his diabetes and submitted a letter from his podiatrist.

At the same time as his doctor's letter, Schneider also sought an accommodation from Giant for his disability. Schneider's doctor requested in a letter that Schneider be returned to his previous position as a pharmacy supervisor, which did not require standing for 8-12 hours a day. Schneider also sent a letter to the Director of Human Resources at Giant

19

seeking to be reassigned to his previous position, but he never received a response to the letter.

Despite this evidence, Giant's refusal to approve Schneider's request to be restored to his previous position as a pharmacy supervisor does not mean that Giant failed to provide reasonable accommodations in violation of the ADA.

Under the ADA, an employer must make "reasonable accommodations" for a disabled employee, unless the company can demonstrate that the accommodation "would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). The ADA does not require that the employer go out of his way to provide an accommodation for a disabled employee, but only requires that accommodations are "reasonable." See Vande Zande v. State of Wis. Dep't of Admin., 44 F.3d 538, 542 (7th Cir. 1995) ("To 'accommodate' a disability is to make some change that will enable the disabled person to work . . . [and] at the very least, the cost could not be disproportionate to the benefit."). This court has found that the ADA does not require reassignment "when it would mandate that the employer bump another employee out of a particular position." E.E.O.C. v. Sara Lee Corp., 237 F.3d 349, 355 (4th Cir. 2001). An employer is not required to violate another employee's rights in favor of an employee with a disability in order to give the disabled employee a reasonable accommodation.

20

Id. at 353-54; see also Daugherty v. City of El Paso, 56 F.3d 695, 700 (5th Cir. 1995) ("[W]e do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled").

In January 2006, however, Schneider had not asked for any accommodation other than to be re-assigned as a pharmacy supervisor. Giant was not required, though, to place Schneider back into his old position. In fact, Giant had since replaced Schneider with another employee because management was unsure when Schneider driver's license would be restored and could not leave the position unfilled. Furthermore, Schneider had not requested any other accommodations for his current position to alleviate the pain in his foot from standing for hours.

Although there may be other alternatives and options that will not require Schneider to be on his feet for his entire work shift in the pharmacy manager position, Schneider neither requested such alternatives, nor requested to discuss any other potential accommodations with his supervisors. The record further reflects that Giant's management knew about and were concerned about Schneider's diabetic neuropathy and the effect that standing would have on his feet, and provided a stool for Schneider to sit on during his shifts. In any event, the mere fact that Giant refused to reassign Schneider to the position of

21

pharmacy supervisor does not show that Giant <u>failed</u> to give Schneider a reasonable accommodation for his disability.

## IV.

For the reasons set forth herein, the judgment of the district court is

AFFIRMED.